Commonwealth of Pennsylvania, Department of Transportation, Petitioner *v.* John M. Lastooka, t/d/b/a Ram Construction Company, Respondent.

Argued April 9, 1981, before President Judge CRUMLISH and Judges ROGERS and BLATT, sitting as a panel of three.

*George D. Wenick,* Assistant Attorney General, with him *Paul A. Logan,* Assistant Attorney General, *Ward T. Williams,* Chief Counsel, and *Harvey Bartle, III,* Acting Attorney General, for petitioner.

*Richard B. Tucker, III,* with him *Anthony P. Picadio, Tucker, Arensberg, Very & Ferguson,* for respondent.

OPINION BY JUDGE ROGERS, May 29, 1981:

The Commonwealth's Department of Transportation has appealed from a judgment entered against it by the Board of Claims in favor of John Lastooka, trading as Ram Construction Company, in the total amount of $106,942.05 for work performed by Lastooka additional to the work called for in the formal contract between the parties under which Lastooka agreed to construct Section 2 of a railway spur connecting a new Volkswagen automobile assembly plant at New Stanton, Westmoreland County, with the main line of the Chessie Railroad system. The Department publicly advertised the Section 2 work for competitive bidding on October 15 and 22, 1976, and proposals were required to be submitted on November 5, 1976. The work was contracted to Lastooka on November 15, 1976, at his bid of $2,356,773.95 based on unit prices for quantities of work and materials estimated by the Department of Transportation to be necessary.

The work for Section 2 consisted of the construction of about five miles of railway spur, included in

which were a cut, an embankment and a bridge which would carry the railway over a public road. The contract was in the usual form furnished and required by the Department of Transportation and contained the usual exculpatory clauses, including the standard covenant required of the contractor that he had been given sufficient time and opportunity to make subsoil examinations.[1] The familiar Form 408 Specifications were incorporated by reference.

Swift, if not hurried, prosecution of the work was required as evidenced by a supplement to Form 408 Specifications, Section 108.07, Liquidated Damages,

---

[1] The parties have briefed and argued from the familiar line of cases concerning the responsibility of the parties with respect to subsoil conditions of which *Pennsylvania Turnpike Commission v. Smith*, 350 Pa. 355, 39 A.2d 139 (1943) and *Branna Construction Corp. v. West Allegheny Joint School Authority*, 430 Pa. 214, 242 A.2d 244 (1978) are leading examples. Lastooka testified that the time between October 25, 1976, when he first learned of the project (which had been first advertised only 10 days earlier) and November 5 when he was required to bid was not sufficient for him to make an independent subsoil examination and that it was probable that he could not have made an investigation if he tried because the Department of Transportation had not yet acquired the necessary rights of way. The Department of Transportation provided the bidders with an engineer's geological survey dated October, 1976, but based on field examinations and ground samplings taken in July and August of 1976. Section 9B of this report, says that excavated material having moisture content above optimum can be placed in the embankment but that material which displays elasticity or deformation during construction should be dealt with as specified in Section 201.3(c) of the Form 408. Section 210.3(c) provides, *inter alia*, that "in embankment area, . . . material [with excessive moisture content] shall be removed. . . ."

As we noted in the body of the opinion, the issue is not whether Lastooka, not having made his own geological tests, can be heard to complain of the wet material in the cut which his independent tests may have disclosed but whether, having encountered wet material, and having asked, and been refused, permission to waste it, he should be required to bear the expense of repairing slides in the embankment caused by the incorporation of such wet material.

by which the Commonwealth informed Lastooka that the Commonwealth had represented to Volkswagen that the railway would be open to traffic by September 30, 1977. The same provision imposed liability on Lastooka to indemnify the Commonwealth for any damages it might be required to pay Volkswagen resulting from delay in finishing the work and also for the payment to the Commonwealth of the amount of tax revenues from Volkswagen which the Commonwealth should lose for the same cause—both in addition to the Liquidated Damages called for in the contract. Further, the liquidated damages for failure to complete were fixed in at $15,000 a day, in contrast to the $300 a day provided by the unsupplemented version of Section 108.07 for contracts exceeding $2,000,000. The contract also required that all suitable materials obtained by excavation for the cut should be used in constructing the embankment.

Lastooka finished the contract work for Section 2 by May 11, 1977. However, in June, 1977, parts of the embankment failed and in the summer of 1977 movement was discovered in the railway bridge. On demand of the Department of Transportation, Lastooka corrected these conditions at a cost, he claimed, of $112,201.32 for repairing the embankment and $8,984.65 for repairing the bridge. These two items plus a claim for $35,416.80 for additional borrow constituted his total claim for $156,602.77 filed with the Board of Claims. The Board of Claims entered judgment for Lastooka in the amount of $87,916.84 for the repairs to the embankment, $8,634.41 for repairs to the railway bridge, and $10,390.80 for additional borrow, these sums totalling $106,942.05, as first mentioned herein.

At the trial conducted by the Board of Claims, the parties created a vast record, which we have examined with appropriate care. Many of the crucial facts con-

cerning the failure of the embankment and the movement of the railway bridge are undisputed. All of the witnesses testified that the embankment failed and the bridge moved because some of the materials from the cut placed on the embankment were too wet. Lastooka's evidence was to the effect that he recognized that the excavated material was too wet and that he repeatedly asked permission of the Department of Transportation's Project Supervisor (also referred to in the record as the Project Engineer or Chief Inspector) for permission to waste, that is, discard, this wet material and to borrow, and use, other drier material from other sources; and that the Project Supervisor refused permission, insisting that the materials taken from the cut were to be used, although wet. The Project Supervisor does not deny that he refused permission to waste. He and other Commonwealth witnesses testified that this was proper because the materials Lastooka wanted to waste were suitable, that is, the kind of material called for in the specifications, and that Lastooka should have dried the wet material. Lastooka countered that time and other conditions did not allow this and it is clear that the Project Supervisor and his several assistants were present when the wet material which Lastooka wanted to waste was placed on the embankment and that indeed the Department personnel from time to time required Lastooka to move the wet materials on, off and about the embankment in order to achieve better compaction.

The pertinent regulations are the following provisions of Form 408:

## SECTION 206 EMBANKMENT

. . . .

206.2 MATERIALS—Material for embankment construction shall consist of all excava-

tion on the project except such material as may be determined to be unsuitable by these specifications and, when required, will include approved Common Borrow Excavation, Foreign Borrow Excavation, and Selected Borrow Excavation.

. . . .

(b)   Suitability of Material.

. . . .

3.   Wet Material.   Material containing moisture in excess of that percentage which will ensure satisfactory compaction, as specified in Section 206.3(d)1., shall not be placed in the embankment, and embankment material shall not be placed on material that has become unstable due to excessive moisture.

. . . .

(c)   Waste Material.   Material from all classes of excavation which is unsuitable and any surplus of material not required in the construction of embankments, shoulders, and approaches, or the widening of the roadway or the embankment slopes will be considered waste, and shall, unless otherwise directed by the engineer, be disposed of by the contractor beyond the limits of the project.

Suitable materials, including wet or frozen materials which would be suitable when dried or when thawed and dried, may be wasted by the contractor for his convenience only with the written permission of the engineer, and subject to replacement in equivalent volume, at the expense of the contractor.

. . . .

Much time was spent in the course of the hearing over the meaning of the word suitable. The wet material was undoubtedly suitable in the sense that as A-6, A-7 and A-4 soils, it was within specification. However, as Section 206.2(b)(3) provides, wet materials "shall not be placed in the embankment" and as Section 206 (c) allows "suitable materials, including wet . . . materials which would be suitable when . . . dried, . . . [to] be wasted . . . with the written permission of the engineer . . . at the expense of the contractor."

In sum, there are facts of record which would amply support findings which would in turn support a conclusion that liability for the cost of repairing the embankment and the railway bridge lay upon the Commonwealth for its failure to allow wasting of wet materials which everyone agrees caused the injuries at issue. Unfortunately, however, the Board of Claims made no findings on this issue. The Board's only references to the issue of the failed embankment appears as "it is the opinion of this Board that some of the arguments presented by the Plaintiff are valid" and at another place "the Plaintiff does have a justifiable claim for the cost of the labor, equipment and pipe and slag used in reconstructing the bank." Not being the factfinder, we may not speculate as to what evidence the Board considered compelled these beliefs; and we are required to reverse and remand the record for findings and decision based thereon.

Force account work is work additional to that called for by the contract, ordered to be done by the Department of Transportation and agreed to be paid for on a time and material basis. The Board of Claims found that the repairs to the railway bridge were done by Lastooka as a force account item. It is true that Lastooka billed the Department of Transportation as if the work were done on force account but we find no evidence in the record that the Department of Trans-

portation ordered the work done as a force account item. In fact the Department of Transportation asserted that the movement of the railway bridge was from the same cause as the failure of the embankment and was Lastooka's responsibility to repair at his expense both under the facts and by reason of another exculpatory clause to be found in Form 408 at Section 206.3(f). Since the evidence is to the effect that the failure of the embankment caused the movement of the bridge, the liability for the cost of repairing the bridge similarly would lay with the party found to have been responsible for placing the wet material in the embankment, which everyone agrees caused its failure. This issue must also go back to the Board for findings and disposition based thereon.

Finally, we will affirm the Board of Claims' judgment for $10,390.80 representing additional borrow occasioned by the small amount of waste ordered by the Project Supervisor, which seems to have consisted mainly of limestone boulders too large to use. There is evidence in the record supporting the Board of Claims' finding that a total of about 8,500 cubic yards of additional borrow should be paid by the Department of Transportation consisting of testimony that the Project Supervisor did allow waste of the large boulders just mentioned. The Board disallowed Lastooka's claim for an additional 19,456 cubic yards of borrow represented by waste deposited on the so-called Summy Waste Area as being the replacement of suitable material improvidently wasted by Lastooka. Since Lastooka has not appealed, this determination may not be disturbed.

In summary, we reverse the Board's judgments in favor of Lastooka in the amounts respectively, of $87,916.84 for repair of the embankment and $8,634.41 for repair of the railway bridge; and we remand the record for findings of fact and disposition of Lastooka's

claims with respect to these items; but we affirm the Board of Claims' judgment in the amount of $10,390.80 representing additional borrow.

## ORDER

AND Now, this 29th day of May, 1981, we reverse the judgments of the Board of Claims in favor of John Lastooka, trading as Ram Construction Company, in the amount of $96,551.25 for repair of an embankment and railway bridge and we remand the record for findings of fact and disposition of these items of claims; we affirm the Board of Claims judgment in favor of John Lastooka, trading as Ram Construction Company, in the amount of $10,390.80 for additional borrow.