529 A.2d 576

Glasgow, Inc., Petitioner *v.* Commonwealth of Pennsylvania, Department of Transportation, Respondent.

Commonwealth of Pennsylvania, Department of Transportation, Petitioner *v.* Glasgow, Inc., Respondent.

Argued June 11, 1987, before President Judge CRUMLISH, JR., Judge COLINS (P), and Senior Judge NARICK, sitting as a panel of three.

*Otis W. Erisman,* with him, *Wilbur L. Kipnes, Schnader, Harrison, Segal & Lewis,* of Counsel, for petitioner/respondent, Glasgow, Inc.

*John J. Buchy, Jr.,* Assistant Counsel, with him, *Spencer A. Manthorpe,* Chief Counsel, and *Henry G. Barr,* General Counsel, for respondent/petitioner, Department of Transportation.

OPINION BY SENIOR JUDGE NARICK, July 28, 1987:

Petitioner Glasgow, Inc. (Glasgow) appeals and Respondent Commonwealth of Pennsylvania, Department of Transportation (Department) ' cross-appeals from an order of the Board of Claims (Board). We affirm.

This matter involves a contractual dispute between Glasgow, a Pennsylvania corporation engaged in the construction business, and the Department. On June 26, 1969, Glasgow entered into a contract with the Department whereby Glasgow was to perform certain highway and bridge construction regarding a certain portion of highway and bridge on Legislative Route (L.R.) 1016-8A, and located in Allegheny County.

The instant dispute arises out of delays in construction of a portion of L.R. 1016-8A at the interchange between L.R. 1016-8A and the Penn Lincoln Parkway (Parkway).[1] Glasgow's claim for damages focuses on bridge S-7944, which is a two-tiered structure with its lower portion resting on the Parkway.[2] Bridge S-7944 carries ramps over L.R. 765.

A certain bypass and other temporary structures were necessary to this project for the purpose of routing traffic off the Parkway and onto the bypass during construction. This temporary bypass which enabled Glasgow to perform reconstruction of the Parkway was constructed and used throughout the term of the project.[3] The temporary bypass could not be removed until the reconstructed Parkway could again carry traffic. The project could not be completed until the temporary bypass was removed.

The two-tiered substructure of S-7944, as originally designed by the Department, included pier footers,[4] pier columns and pier caps.[5]

---

[1] The Penn Lincoln Parkway connects downtown Pittsburgh with the Airport.

[2] Bridge S-7944 is a two-tiered structure with the lower portion carrying the Parkway over Campbells Run Road and the upper structure carrying ramp B of I-79 over the Parkway.

[3] The temporary bypass was located north of the Parkway.

[4] Pier footers are the foundation of the bridge.

[5] Pier caps are concrete beams poured into place to receive the structural steel.

On or about March 28, 1972, the Department issued a stop order on the construction of pier 1 of S-7944 because testing revealed that the subsurface material was insufficient support for the foundation which had been designed for that pier. On or about April 26, 1972, the Department ordered a halt to the construction of pier 2 of S-7944 due to insufficient subsurface materials.

The evidence before the Board revealed the following. After issuing the stop orders regarding pier 1 and pier 2, the Department decided to redesign the substructure for both piers. Glasgow had been, up until the issuance of the stop orders, performing its obligations under the contract in a timely fashion. On or about June 26, 1972, Glasgow received the new design for the piers. However, as a result of the Department's stop orders, redesign, and additional work, the construction of S-7944 was delayed for approximately three months. The delay in completion of S-7944 delayed removal of the bypass which in turn delayed completion of the project as per the terms of the contract. Glasgow, in its complaint, alleged it suffered damages in the amount of $874,790.50 as a result of the Department's breach of contract. After twenty-three days of hearings, the Board issued an order on January 6, 1986 which concluded that the redesign by the Department was a breach of contract which resulted in $389,645.44 in damages to Glasgow.[6]

The issues presented for our consideration are: (1) whether or not there was substantial evidence to indicate that the redesign of pier 1 and pier 2 resulted in damages to Glasgow; (2) whether or not the Board erred

---

[6] It should be noted that the present cause of action was brought on behalf of Glasgow and its paving subcontractor Chapin for damages allegedly suffered by both parties as a result of the Department's breach of contract. However, Chapin does not participate in this appeal.

in awarding damages on a total cost basis; (3) whether or not there was substantial evidence to support the Board's conclusion that 64.43% of Glasgow's damage claim was attributable to Glasgow's performance of extra work, and therefore properly excludable as an allowable damage expense; and (4) whether or not the Board correctly held that the instant cause of action was not barred by the doctrines of res judicata and collateral estoppel.

We are mindful that our scope of review is limited to a determination of whether constitutional rights were violated, an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C. S. §704; *Estate of McGovern v. State Employees' Retirement Board,* 512 Pa. 377, 517 A.2d 523 (1986).

First, we will discuss the Board's award of damages to Glasgow and its utilization of the total cost theory for calculating damages.[7] In its opinion, the Board stated:

> Glasgow has proven that the delay in this instance caused a breach of the contract between the parties and as a result thereof Glasgow did sustain certain damages. This proof has been of a sufficient nature to comply with the law of the Commonwealth. . . . The Board, was presented with evidence, both physical and testamentary in nature, that would allow it to find that damages are due to the injured party.

The Board, in concluding that the total cost method was the appropriate theory to be applied in calculating

---

[7] In order to avoid an unwarranted expenditure of time and space, we will discuss Glasgow's and the Department's arguments regarding the total cost theory and the Board's award of damages collectively. We note, however, that we have carefully considered the record evidence regarding each argument presented by counsel for both parties.

Glasgow's damages indicated that "despite extensive record keeping and a genuine good faith effort to do so, the Plaintiff [Glasgow] was not able to specifically list the precise dollar amount of every cost incurred as a result of the Department's breach of this contract".

The Board's calculations with regard to the total cost method are as follows. Glasgow's overhead costs incurred as a direct result of the delay in construction were incurred during the year of 1973 and totalled $78,482.46. As to the amount of damages due Glasgow other than overhead costs the Board determined it could not accept the entire amount of delay damages claimed by Glasgow. More specifically, the Board concluded that the damages allegedly incurred for extra work performed could not be included in Glasgow's damage calculations. The Board in calculating damages other than overhead did accept as a starting point Glasgow's original damage calculation, including extra work, of $874,790.50. Based upon the testimony of the Department's accounting witness, Louis Rubino, the Board determined that extra work constituted 64.43% of the work performed.[8] The Board, by subtracting 64.43% or $563,627.52 from $874,790.50, assessed Glasgow's damages excluding overhead costs at $311,162.98. Thus, by combining $78,482.46 with $311,162.98 the Board concluded that Glasgow's total damages were $389,645.44.

The total cost method for calculating damages involves the subtraction of the estimated costs set forth in the contract from actual costs. *See E. C. Ernst, Inc. v. Koppers Co., Inc.*, 626 F.2d 324 (1980) which applied Pennsylvania law involving construction contracts. The Courts, recognizing that the total cost method is subject to speculation, will only utilize this method when there

[8] Mr. Rubino based his opinion upon the project records.

is no other means of determining damages and the plaintiff has presented reasonably accurate evidence of the various costs incurred. *Id., John F. Harkins Co. v. School District of Philadelphia,* 313 Pa. Superior Ct. 425, 460 A.2d 260 (1983), and *Armbruster and Sons, Inc. v. State Public School Building Authority,* 95 Pa. Commonwealth Ct. 310, 505 A.2d 395 (1986). In order for a contractor to establish liability under the total cost theory, it is essential that the contractor establish liability, causation, and resultant injury. *See Wunderlich Contracting Co. v. United States,* 351 F.2d 956 (1965) and *Harkins.* When a contractor takes his total cost less his estimated cost under the contract pursuant to the total cost theory, adjustments must be made for various costs incurred which were not a result of the defendant's breach of contract. *Boyajian v. United States,* 423 F.2d 1231 (1970). *Also see Great Lakes Dredge & Dock Co. v. United States,* 96 F. Supp. 923 (1951) and *Wunderlich.* Thus, in order to justify an award under the total cost theory, evidence must be presented by the injured contractor which establishes with reasonable certainty that its increased costs were directly due to the actions of the defendant.

Glasgow presented extensive testimony regarding the effect of the three month delay, which was contrary to the terms of the contract, on the construction project, and the increased costs it incurred as a result of the delay.[9] After carefully reviewing the record in this case,

---

[9] William Gelbach, Vice-President and General Manager of Glasgow, testified as to the effect the three month delay had on Glasgow's work as well as the work of Glasgow's subcontractors on the project. Mr. Gelbach also testified that up until the time stop orders were issued, Glasgow was performing within the time constraints set forth in the contract, but that the three month delay resulted in, not only performing the remainder of the project in the less favorable working months of fall and winter, but also schedul-

we find no error in the Board's acceptance of the evidence presented by Glasgow which indicated its total damages including extra work were $874,790.50. In addition, we find no evidence in the record which would establish a precise dollar amount of the damages suffered by Glasgow; therefore, the Board's utilization of the total cost theory was proper.

Regarding the Board's exclusion of extra work costs in *Department of Transportation v. Acchione and Canuso,* 55 Pa. Commonwealth Ct. 65, 423 A.2d 30 (1980), reversed on other grounds, 501 Pa. 337, 461 A.2d 765 (1983), the Court, in denying a contractor recovery for costs incurred in performing additional work, reasoned that where a contractor fails to negotiate for an increase in the amount to be paid for additional work pursuant to the terms of the contract no recovery will be allowed in a subsequent suit brought to collect additional monies. Here, Glasgow, despite specific contract provisions regarding payment for extra and additional work, failed to negotiate for an increase.[10] Therefore,

---

ing conflicts with subcontractors who were obligated to perform other contracting jobs. In addition, Mr. Gelbach, in regard to the damages suffered by Glasgow, testified as to the total cost theory of damages. Mr. Gelbach based his opinion upon his personal involvement with the project as well as the project records. Another witness testifying for Glasgow was James O'Brien, a licensed professional engineer who was offered as a construction project management expert, testified as to the length of time the project was extended as a result of the three month delay and the damages suffered by Glasgow as a result. Mr. O'Brien based his opinion on project records.

[10] The contract provides in Section 1.9.2: "Additional and Extra Work—the contractor shall do such additional work . . . at the unit price shown in the contract, and in the same manner as if it had been included in the contract. Any work having no quantity and prices included in the contract . . . will be done as extra work, at a price to be agreed upon previously in writing by the contractor and the engineer and approved by the Chief Engineer . . .".

recovery by Glasgow for extra work was properly denied by the Board.

With respect to Mr. Rubino's testimony, Glasgow contends that the Board's reliance on Mr. Rubino's estimate that 64.43% of the work performed by Glasgow in 1973 involved extra work was improper because Mr. Rubino testified that he did not want anyone "to apply that percentage [64.43%] to anything". However, Glasgow has taken this testimony out of context. Mr. Rubino, who testified on behalf of the Department, indicated that Glasgow's total estimate of damages of $874,790.50 was inaccurate, but if this amount was to be considered as Glasgow's increased costs, then extra work consisted of 64.43% of this amount.[11] Accordingly, based upon the record in this case, the Board's conclusions must be sustained.

The last issue presented for our consideration is whether or not the Board erred when it held that Glasgow's cause of action was not barred by res judicata

---

[11] Mr. Rubino testified in regard to Glasgow's utilization of the total cost theory as follows:

Q: To get back to the percentage [64.43%] are you saying that the percentage is not all important in the section of your opinion that I read there?

A: The context with which I said the percentages is not important is that we are not coming up with an amount claimed on adjusted amount claimed. We have cited difficulties and problems with the methodology. Those difficulties and problems exist, they exist whether the percentage is 64% or 44%, okay?

Q: Or 20% or 5%?

A: Or 20% or 5%.

Q: The magnitude differs, doesn't it?

A: No because what you are doing is you are taking that one segment and saying then, if we were to reconstruct the claim amount based solely on that alone we come up with a different number. That's not what we're saying and that's not what we're doing.

or collateral estoppel. The Department contends that the instant claims are barred by res judicata and/or collateral estoppel because Glasgow previously initiated a claim against the Department for damages on behalf of its subcontractor, Bethlehem Steel Corporation arising from the redesign by the Department of pier 1 and pier 2 of bridge S-7944.[12] It is long settled that in order for a party to successfully establish the defense of res judicata four identities must exist: (1) identity of issues, (2) identity of causes of action, (3) identity of persons and parties to the action, and (4) identity of a quality or capacity of the parties suing or sued. *Safeguard Mutual Insurance Co. v. Williams,* 463 Pa. 567, 345 A.2d 664 (1975) and *Day v. Volkswagenwerk Aktiengesellschaft,* 318 Pa. Superior Ct. 225, 464 A.2d 1313 (1983). In order for collateral estoppel to operate and bar a subsequent cause of action, four conditions must also be present: (1) the issue decided in the prior adjudication was identical with the present action; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was in privity with the party to the prior adjudication; and (4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action. *Safeguard* and *Volkswagenwerk.* The existence of one contract does not preclude the existence of only one cause of action. *Commonwealth v. Pace,* 64 Pa. Commonwealth Ct. 273, 439 A.2d 1320 (1982). When part of a contract consists of several distinct items and the price to be paid is apportioned, the contract is severable. *Id.; Sobole v. Will Allen Builders, Inc.,* 244 Pa. Superior Ct. 486, 368 A.2d 825 (1976). *Also see Philadelphia v. Heinel Motors,* 346 Pa. 528, 31 A.2d 104 (1943). Here, the Board correctly

---

[12] The *Bethlehem Steel* case is at Board of Claims Docket No. 317.

determined that one contract existed; however, many separate parties were part of the agreement. There were distinct items to be paid for in the contract and the causes of action initiated in order to recover upon these separate items were not essentially the same causes of action. Thus, in order for the Department to prevail on the defense of either res judicata or collateral estoppel, the issues raised in *Bethlehem Steel* must be the same issues raised in the instant matter. It should be noted that Glasgow did in fact present a motion for consolidation to the Board of the present case with *Bethlehem Steel,* but this motion was contested by the Department and also rejected by the Board.[13] In *Bethlehem Steel,* the issue presented to the Board was whether the redesign of the pier footings delayed the completion of S-7944 and caused delays under the contract to Bethlehem Steel. In the case at hand, the issues presented to the Board were the effects the delay of S-7944's completion had upon the project and what type of damages accrued to Glasgow. The Board was also confronted with the determination as to the time period which Glasgow was delayed in completing the project due to the Department's breach. Accordingly, based upon the foregoing discussion, we are satisfied that the case at hand is not barred by res judicata or collateral estoppel.

Therefore, our independent review of the record in this case constrains us to conclude that the order of the Board must be affirmed.

## ORDER

AND NOW, this 28th day of July, 1987, the order of the Board of Claims in regard to the above-captioned matters is hereby affirmed.

---

[13] The Board indicated in its findings of fact that its reason for denying Glasgow's motion for consolidation was because of the inadequate time which existed in which to prepare and present the second action (the present case) by the date set for hearing on the first action (the Bethlehem Steel case).