Carmen PALIOTTA, an individual t/d/ b/a Carmen Paliotta Contracting Company, Petitioner,

v.

DEPARTMENT OF TRANSPORTATION, Respondent.

Department of Transportation, Petitioner,

v.

Carmen Paliotta, an individual t/d/b/a Carmen Paliotta Contracting Company, Respondent.

Commonwealth Court of Pennsylvania.

Argued Nov. 4, 1999.
Decided Dec. 22, 1999.
Publication Ordered April 14, 2000.

D. Matthew Jameson, III, Pittsburgh, for petitioner.

Michael D. Alsher, Harrisburg, for respondent.

Before FRIEDMAN, J., LEADBETTER, J., and RODGERS, Senior Judge.

FRIEDMAN, Judge.

Carmen Paliotta, an individual t/d/b/a Carmen Paliotta Contracting Company (Paliotta) appeals from an order of the Board of Claims (Board) finding in favor of Paliotta and against the Department of Transportation (Department) in the amount of $144,105.86 with six per cent interest from May 10, 1993. The Department has filed a cross appeal.

On or about May 23, 1991, the Department sought bids for a contract to improve a section of State Route 30 in Beaver County (the Project). In a letter dated June 27, 1991, the Department declared Paliotta the lowest responsive bidder. Paliotta was to begin work on the Project on July 29, 1991 and was to complete the Project ninety-two calendar days later on October 28, 1991. (Findings of Fact, Nos. 8–9, 12.)

The start of the Project was delayed because the state budget for the 1991–1992 fiscal year was not signed into law until August 4, 1991. Because of this delay, the Department did not officially award the contract to Paliotta until August 7, 1991. The parties executed the contract in the weeks following August 7, 1991, and the Department held a pre-construction conference on August 30, 1991. On September 4, 1991, the Department issued a revised work schedule, increasing the duration of the Project from ninety-two calendar days to 268 calendar days because of a "winter shutdown." (Findings of Fact, Nos. 14, 16–19, 21.)

The Department gave Paliotta a "notice to proceed date" of September 16, 1991. Hoping to complete the Project as quickly as possible, Paliotta began site preparation work on September 9, 1991. On September 11, 1991, Paliotta realized that the Project could not be built as planned because of a design defect. The Department modified the design to correct the problem, thereby causing Paliotta to incur unanticipated construction costs. (Findings of Fact, Nos. 40–41, 50–71.)

Another problem arose later in the fall of 1991. The Department had represented to Paliotta that Duquesne Light Company would relocate its utility poles so that Paliotta could widen the road pursuant to the Project's work schedule. However, Duquesne Light Company had not performed the work. When Paliotta proposed that he move ahead with the widening of the road by constructing the concrete curb gutter behind the existing utility poles, the Department rejected the proposal. As a result, Paliotta was not able to begin widening the road and constructing the concrete curb gutter until May 1992. (Findings of Fact, Nos. 72–73, 76, 82, 84.)

Upon completion of the Project, Paliotta filed a complaint with the Board seeking damages from the Department for increased construction costs caused by the delays and design flaw. The Board held hearings and, based on the evidence pre-

sented, awarded Paliotta damages in the amount of $144,105.86 with six per cent interest from May 10, 1993.

## I. Paliotta's Appeal

### A. Extended Home Office Overhead

■ On appeal to this court, Paliotta first argues that, based on the Eichleay formula,[1] he is entitled to additional damages for extended home office overhead for the period of time beyond the original ninety-two days duration of the Project.[2] We disagree.

Section 111.02 of the Department's Publication 408, which governs delay claims against the Department,[3] states that home office overhead "cannot be included in any delay claim against the Department." Section 111.04(d) of Publication 408 (emphasis added) states:

> Only expenses for extra non-salaried labor, material, and equipment costs will be considered by the Department in the event it is determined that operations were delayed by the Department. *To these costs will be added 10% to cover allocable home office overhead.* Likewise, in the event a delay claim is filed

with the Board of Claims, only the foregoing expenses may be claimed.

Thus, Paliotta may recover delay damages for home office overhead *only* as ten per cent of his extra costs for non-salaried labor, material and equipment.[4] That is *not* what Paliotta seeks here. Rather, Paliotta seeks additional damages for home office overhead based on the Eichleay formula. Such a claim is prohibited by section 111.02 of Publication 408.

Accordingly, we affirm the Board's denial of Paliotta's extended home office overhead claim.

### B. Extended Equipment Costs

■ Next, Paliotta argues that he is entitled to additional damages in the amount of $56,636.61 for equipment "standby" costs for the period of time beyond the original ninety-two-day duration of the Project. Paliotta maintains that the Board should have accepted his estimate of $56,636.61 as a reasonable substitute for evidence of his actual equipment costs. We disagree.

The final paragraph of section 111.04(d) of Publication 408 (emphasis added) states as follows:

---

1. The Eichleay formula is a method adopted by federal courts for the calculation of home office overhead in cases where the government has caused a delay in the completion of a contract and, as a result, the contractor is seeking damages. The Eichleay formula divides the ratio of contract billings to total billings for the period of performance into the contractor's daily office expenses and then multiplies that amount by the number of days of delay to arrive at the amount of the claim. *Satellite Electric Co. v. Dalton*, 105 F.3d 1418 (Fed.Cir.1997).

2. Our scope of review is limited to determining whether constitutional rights were violated, whether an error of law was committed or whether the findings of fact are supported by substantial evidence. *Department of Transportation v. Anjo Construction Co.*, 666 A.2d 753 (Pa.Cmwlth.1995). "The burden of proof is on the contractor who seeks reimbursement from the Commonwealth for increased costs, charges, expenses or damages to show the facts necessary for such recovery." *Department of Transportation v. Burrell Construction*

*& Supply Co.*, 111 Pa.Cmwlth. 590, 534 A.2d 585, 587 (1987).

3. Although Paliotta's contract with the Department states that Publication 408 contains the "applicable Specifications" for the Project, (O.R., vol. 8, exh. 21 at 000164), Publication 408 was not made part of the certified record transmitted to this court on appeal. Pursuant to Pa. R.A.P.1926, this court directed the Board to certify and transmit to this court a supplemental record containing the relevant sections of Publication 408. The Board filed the supplemental record on November 10, 1999.

4. We note that the Board awarded a 10% mark-up for home office overhead under section 111 of Publication 408 with respect to Paliotta's rental of temporary "impact attenuators" for the period of the delay, (Findings of Fact, No. 142), and with respect to Paliotta's increased labor costs, (Findings of Fact, No. 157).

When measuring additional equipment expenses (i.e. ownership expenses) arising as a direct result of a delay caused by the Department, *do not use in any way the Blue Book* or any other rental rate book similar thereto. *Use actual records* kept in the usual course of business, and measure increased ownership expenses pursuant to generally accepted accounting principles.

Paliotta's expert, Mark M. Gleason, C.P.A., testified that, in calculating the extended equipment costs claim, he intended to "quantify Paliotta's loss of value on [his] equipment." (R.R. at 198a; N.T. at 659.) Gleason explained that, because the equipment was idle, Paliotta could not generate revenue to recover the depreciation of the equipment.[5] (R.R. at 199a; N.T. at 661.) Inasmuch as Paliotta's extended equipment costs claim involves a recovery of depreciation, it involves an "ownership expense."[6] Thus, section 111.04(d) of Publication 408 applies here.

Although section 111.04(d) requires that contractors use actual business records to support their claims for equipment ownership expenses, the Board found that Paliotta could not provide with any degree of reasonable accuracy his actual equipment costs for the period of the delay. (Findings of Fact, No. 173.) Paliotta does not dispute that finding. Paliotta merely asserts that he "did not maintain [his] accounting records in such a manner that [his actual equipment costs were] ... retrievable." (Paliotta's brief at 26.) Thus, in presenting his claim for extended equipment costs, Paliotta failed to comply with section 111.04(d) of Publication 408.[7]

Accordingly, we affirm the Board's denial of damages for extended equipment costs.

### C. Curb Gutters

■ Paliotta also argues that he is entitled to additional damages in the amount of $32,949.53 for the Department's interference with his construction of the curb and gutters in the fall of 1991. In this regard, the Board made the following relevant findings:

77. Paliotta testified that he originally bid to do most of the curb gutter, 95% of it, utilizing a slip form subcontractor.[8] Mr. Tribuzio [9] testified that they were looking into slip forming the curb gutter and [that they] contacted Highway Pav-

---

5. Paliotta reiterates Gleason's testimony in his brief, stating that "Paliotta was not able to absorb the depreciation of the equipment" because the equipment was idle. (Paliotta's brief at 25.)

6. Other possible "ownership expenses," or standby costs, would include insurance, interest, maintenance and storage.

7. Instead of his actual costs, Paliotta offered an estimate that Gleason computed on a "force account" basis. (Findings of Fact, No. 169.) However, the "force account" provision of the contract applies only to "extra work." *See* Section 110.03(c) of Publication 408. Here, Paliotta did not use his equipment to perform "extra work;" rather, Paliotta used his equipment to perform only work required by the original contract. (Findings of Fact, No. 170.) Therefore, the "force account" provision of the contract does not apply here.

   We also note that Gleason used the "Blue Book standby rate" to arrive at his "force account" estimate. (R.R. at 183a–84a; N.T.

at 575–76.) Although contractors may use the "Blue Book" to determine equipment costs relating to "force account" work, *see* Section 110.03(d)(3) of Publication 408, contractors may *not* use the "Blue Book" in any way to determine equipment ownership expenses resulting from a delay. Section 111.04(d) of Publication 408.

8. Paliotta testified that, when he bid the job, he planned to prepare 95% to 98% of the road by excavating and by putting in the subbase and "under drain" for the curb gutters. (O.R., vol. 3, N.T. at 90.) Then, a subcontractor would bring in a "slip form machine" to pour the concrete curb gutters. (O.R., vol. 3, N.T. at 90–91.) Paliotta testified that "slip form machines" have the ability to pour 400 or 500 feet of concrete curb gutter per day where there is a "straight run." (O.R., vol. 3, N.T. at 90.)

9. Russell Tribuzio was Paliotta's superintendent on the Project. (Findings of Fact, No. 4.)

ing by phone early in the job [to discuss the matter].... (N.T. 90–93, 270, 307–312)

78. In the [fall] of 1991, Paliotta proposed starting the curb gutters in late [fall] 1991 and completing [them] in the [spring] of 1992....[10]

79. The Department rejected this idea....

. . . .

86. At the time of the bid, Mr. Payne[11] opined that Paliotta's estimate of constructing 225 feet of curb gutter per day was reasonable[12] and was based on Paliotta's using hand-forming construction methodology.[13] (N.T. 382–383)

87. Based on his review of both Paliotta's and the Department's Project diaries, Payne concluded that as a result of using the methodology required by the Department,[14] Paliotta poured concrete

10. Paliotta testified that, when he made this proposal, he still planned on using a "slip form paver" so that he could pour the concrete curb gutter "all at one time." (R.R. at 154a; N.T. at 177–78.) Gleason testified that "Paliotta intended to be able to perform the curb and gutter work as a separate activity in a continuous manner." (R.R. at 177a; N.T. at 535.)

11. Christopher Payne was an engineer hired by Paliotta to render opinions about the Project in connection with the litigation before the Board. (Findings of Fact, No. 5.) The Board accepted Payne as an expert in construction estimating, construction management, engineering design and construction scheduling. (Conclusions of Law, No. 3.)

12. The Board's finding, as written, states that Payne rendered his opinion "at the time of the bid." That is not correct. Payne was hired for purposes of this litigation; thus, Payne did *not* render his opinion "at the time of the bid." Rather, Payne opined in his testimony before the Board that, at the time of the bid, 225 linear feet per day was a reasonable estimate. Payne stated that the estimate was actually conservative and that "with a slip form ... you could realize a much greater production." (R.R. at 165a; N.T. at 382.) Payne also stated that the Department's own estimate for the pouring of concrete curb gutters was 300 linear feet per

for curb gutter construction on *26 days during the Project* .... (N.T. 388–390)

. . . .

110. This [curb gutter] claim is based on a supposed production rate of ... 225 linear feet per day. (N.T. 382, 536)

111. Mr. Tribuzio established that Paliotta purchased only 300 linear feet (L.F.) of forms for the curb gutter construction. He admitted on cross that the sequence they planned was [to] set 200 L.F. for a pour in the morning.[15] In the afternoon they could set 100 L.F. of forms plus what could be stripped on hot days[ ] from the [morning] pour. Mr. Tribuzio, on cross, admitted that 225 L.F. per day when you set 200 L.F. of forms was a speculative number which didn't happen all the time. Depending on [conditions] it could be more or less.

day. (R.R. at 165a; O.R., vol. 5, N.T. at 384–85.)

13. Tribuzio testified that, ultimately, the Department forced Paliotta to construct the curb gutters in such a way that it was not economically feasible to use a "slip form machine." (O.R., vol. 4, N.T. at 271.) Therefore, Tribuzio had to estimate Paliotta's curb gutter productivity rate based on "hand forming the curb gutters." (O.R., vol. 4, N.T. at 272.)

14. As indicated above, the Department forced Paliotta to "hand form" the curb gutters instead of using a "slip form machine." Moreover, the Department required that Paliotta perform all the work involved in the road widening simultaneously in one phase. (*See* Findings of Fact, No. 88.) Paliotta, on the other hand, had proposed doing the work in three phases, with the curb gutters being done in the first phase using a "slip form machine." (Board's op. at 26–27.)

15. Tribuzio gave the same testimony on direct examination. (O.R., vol. 4, N.T. at 272.) On redirect, Tribuzio stated: "[I]t would only take you maybe an hour to pour. Once you're done pouring, some of the crew would stay and finish the concrete, the other crew would go ahead and continue forming." (O.R., vol. 4, N.T. at 321.) On some days, according to Tribuzio, there would be more than one pour. *Id.*

A lot of times you got less [than] 225 L.F. (N.T. 308–309)

. . . .

113. Based on Mr. Payne's opinion and using 225 L.F. as planned production, Mr. Gleason compared the 12.3 days of concrete crew labor which would have been required using Paliotta's planned methodology [16] and compared it to the 26 actual days of concrete crew work which was actually required. (N.T. 535–538; Exhibit P–Demo 12)

. . . .

116. The cost analysis presented at trial did not establish what all the cost would have been if the Department had allowed Paliotta to build the curb gutter in the fall of 1991.[17] There was no bidding documentation that the [hoped] for 225 L.F. per day was used at the time of bid,[18] no slipform quotes [19] and Mr. Tribuzio could not establish with any degree of certainty that 225 L.F. of curb gutter could be achieved using 300 L.F. of forms. The Board finds that the damages of $32,949.53 are not supported by any reasonable degree of certainty by the facts presented at trial. (Record)

(Findings of Fact, Nos. 77–79, 86–87, 110–11, 113, 116.) (Emphasis in original.) Having made these findings, the Board made the following relevant conclusions of law:

6. In [the] absence of countervailing expert testimony,[20] the Board should accept as true the expert testimony of Mr. Payne and Mr. Gleason.

. . . .

10. The Department owes Paliotta inefficiency damages resulting from its improper interference with Paliotta's selection of means and methods of the curb gutters. . . .

11. Mr. Gleason used a reasonably reliable methodology in determining Paliotta's damages regarding [element 6] of the claim.

(Conclusions of Law, Nos. 6, 10–11.) (Citation omitted.) Element six of Paliotta's claim is the concrete curb gutter portion of the claim. (Findings of Fact, No. 174.)

After making the above findings of fact and conclusions of law, the Board held that Paliotta was entitled to compensation from the Department for interference with Paliotta's means and method of construction. However, the Board did *not* award damages to Paliotta for the Department's interference with curb gutter construction in the fall of 1991. The Board explained that Paliotta failed to present sufficient evidence to show that his "original plan for the curb gutter construction could have

---

16. The Board suggests by this finding that Paliotta planned to "hand form" the curb gutters at 225 linear feet per day. Again, Paliotta did *not* plan to "hand form" the curb gutters; Paliotta planned to use a "slip form paver."

17. The Board found that Gleason's cost analysis did not include the cost of saw cutting the existing pavement, excavating, grading, placing subbase and back filling. (*See* Findings of Fact, No. 115; R.R. at 172a–73a, 189a; N.T. at 472–73, 613–14.) We fail to see the relevance of such a finding. Paliotta is *not* seeking damages for these costs. Paliotta is only seeking to recover the cost of having his concrete crew work 26 days instead of 12.3 days.

18. Although Gleason saw no bid documentation that referenced the 225 linear feet per day, (Findings of Fact, No. 114), Paliotta testi-

fied that, when he bid for the job, he planned to use a "slip form machine" that could pour 400 or 500 feet of concrete curb gutter per day on a "straight run." (O.R., vol. 3, N.T. at 90.) Moreover, Gleason testified that, in Paliotta's original bid, his productivity estimate was 1,441 square yards, which converts into 225 linear feet. (R.R. at 178a; N.T. at 536.)

19. There were no "slipform quotes" because the Department forced Paliotta to abandon his use of a "slip form" subcontractor.

20. The only witnesses to testify as experts were Payne and Gleason; thus, there was no countervailing expert testimony. This means that the Board accepted the expert opinions of Payne and Gleason.

been achieved at the initial desired rate using the planned equipment." (Board's op. at 27.) We disagree with the Board.

Paliotta's "original plan" was to construct nearly all of the curb gutters in one phase using a "slip form machine." According to the credible expert testimony of Payne, a "slip form machine" could have produced much more than 225 linear feet of curb gutter per day. Payne also testified credibly that a production rate of 225 linear feet per day was reasonable even in situations where the curb gutters would be "hand formed." Thus, Paliotta presented sufficient evidence to show that he could have constructed 225 linear feet of curb gutter per day in the fall of 1991.[21] This means that the record and the facts support Gleason's $32,949.53 estimate for curb gutter damages.

Accordingly, we reverse the Board's denial of damages for the Department's interference with Paliotta's construction of the curb gutters.

### D. Interest

Finally, Paliotta argues that he is entitled to interest on the total amount of damages from April 6, 1993, the date when Paliotta filed a detailed accounting of the claim with the Department.

■ "Interest is awarded from the date on which the obligation to pay the amount due under the contract arises, usually the date when the contract is fully performed." *Department of Transportation v. Anjo Construction Co.*, 666 A.2d 753, 760 (Pa.Cmwlth.1995). "Hence, the date from which interest on an award must be calculated is the date on which the Commonwealth's duty to pay arises, not the date the complaint is filed with the Board." *Id.* Interest is properly awarded from the date the contractor presents its claim to the Department. *Id.*

There is no dispute here that Paliotta filed a detailed accounting of the claim with the Department on April 6, 1993; thus, under *Anjo*, Paliotta should receive interest from that date. Accordingly, we modify the Board's award to allow interest on the total amount of damages from April 6, 1993.[22]

### II. Department's Appeal

■ The Department argues that the Board erred in awarding damages for extended "maintenance and protection of traffic" costs based on a pro rata formula instead of Paliotta's actual costs. We disagree.

The Board found that a subcontractor, Marlane Maintenance, Inc. (Marlane), provided for the maintenance and protection of traffic during the period of construction. (Findings of Fact, No. 128.) Marlane had agreed to provide its services for ninety-two days; however, Marlane actually provided services for 368 days. (Findings of Fact, Nos. 129–30.) At the conclusion of the Project, Marlane sought extra compensation from Paliotta. On April 6, 1992, the Department agreed to compensate Paliotta for extended maintenance and protection of traffic on a pro rata basis in accordance with the terms of the contract. (Findings of Fact, No. 133.) On November 12, 1996,

---

21. Tribuzio's testimony was not inconsistent with Payne's testimony. Tribuzio testified only that various conditions influence whether a crew can actually achieve 225 linear feet on a given day. Such testimony does not make the estimate unreasonable. Indeed, Tribuzio testified that, depending on the conditions, the crew might construct *more* than 225 linear feet in a given day.

22. The Department argues that this court's decision in *Anjo* should be "modified" because the Department needs a reasonable time to review and analyze a claim. The Department suggests that thirty days is reasonable and notes that the Board awarded interest from May 10, 1993, approximately thirty days after Paliotta presented the Department with the claim. We decline to overrule our decision in *Anjo*. Cf. *Green Construction Co. v. Department of Transportation*, 164 Pa.Cmwlth. 566, 643 A.2d 1129 (1994), *appeal denied*, 543 Pa. 718, 672 A.2d 311 (1996) (holding that interest payments shall begin on the day after work is completed).

Marlane settled its claim against Paliotta for $22,958.47. (Findings of Fact, No. 131.) Gleason testified that the settlement did not represent the entire cost to Paliotta for extended maintenance and protection of traffic. (Findings of Fact, No. 132.) Therefore, Paliotta sought $41,238.00 in damages from the Department, a figure that Gleason calculated on a pro rata basis. (Findings of Fact, No. 134.) The Board found that this figure was proper under the contract and awarded that amount in damages. (Findings of Fact, No. 135.)

The Department's argument is that, under the original contract, the Department is liable only for the actual costs incurred by the contractor for a delay caused by the Department, and, here, Paliotta's actual costs were only $22,958.47. However, the Department *modified* the original contract when it agreed to compensate Paliotta for extended traffic control on a pro rata basis, and the Board found that $22,958.47 does *not* represent Paliotta's actual cost for extended traffic control. Thus, the Board did not err in basing its award on Gleason's pro rata calculation.

Accordingly, we affirm the Board's award of damages for extended maintenance and protection of traffic on a pro rata basis.

### ORDER

AND NOW, this 22 nd day of December, 1999, that portion of the Board of Claim's (Board) order denying damages to Carmen Paliotta, an individual t/d/b/a Carmen Paliotta Contracting Company (Paliotta), for interference with the construction of curb gutters is reversed. That portion of the Board's order awarding interest on damages from May 10, 1993 is modified to allow interest on damages from April 6, 1993. In all other respects, the Board's order is affirmed.